IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED
OCT 14 2016
DOUGLAS F. YOUNG, Clerk
By
Deputy Clerk

| | |
|---|---|
| **VISUAL DYNAMICS, LLC,** | ) |
| Plaintiff, | ) Case No. 16-5287 TLB |
| vs. | ) |
| **CHAOS SOFTWARE LTD. and CHAOS GROUP, LLC** | ) **JURY TRIAL DEMANDED** |
| Defendants. | ) |

## COMPLAINT

NOW COMES Plaintiff Visual Dynamics, LLC ("Visual Dynamics"), by and through its counsel, and files this action for tortious interference with business expectancy against Defendants Chaos Software Ltd. and Chaos Group, LLC (collectively, the "Defendants") as hereinafter more fully described:

### The Parties

1.  Plaintiff Visual Dynamics is a limited liability company organized under the laws of the State of Arkansas and in good standing. Visual Dynamics has its principal place of business in Springdale, Arkansas, within this judicial district.

2.  Separate Defendant Chaos Software Ltd. is a Bulgarian company having its principal place of business at 147, Tsarigradsko shose Blvd., Inter Expo Center, 4th floor, 1784 Sofia, Bulgaria.

3.  Separate Defendant Chaos Group, LLC is a limited liability company organized under the laws of the State of Maryland, having its principal place of

1

business at 180 W. Ostend St., Ste 267A, Baltimore, Maryland 21230.  It is wholly owned by the Separate Defendant Chaos Software Ltd.  Both Defendants collectively do business together as the "Chaos Group" around the world.

## Jurisdiction and Venue

4.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(3) because this action is between citizens of different States, with an additional party that is a citizen of a foreign state, and the matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.   Therefore, this Court has subject-matter jurisdiction over this case based on diversity of citizenship.

5.     This Court has personal jurisdiction over the Defendants because both Defendants regularly conduct business within this judicial district by providing technical support for their software products to persons residing within this judicial district and by selling their products to residents of this district.  Moreover, Plaintiff and Separate Defendant Chaos Software Ltd. have previously entered into several contractual relationships with each other directly whereby the parties conducted hundreds of thousands of dollars of business buying and selling the Defendants' products, which were shipped from Defendants directly to Plaintiff's principal place of business here in this judicial district.  Accordingly, this Court has personal jurisdiction over the parties.

6. Venue for this action is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) and (c). The Defendants conduct business in this judicial district and are subject to the personal jurisdiction of this Court at all times relevant herein.

## Factual Background

7. The Defendants design, manufacture and sell worldwide their rendering software products using their registered trademarks V-RAY®. These V-RAY® products are sold by the Defendants to their distributors for re-sale, and the distributors then contract with sub-distributors to sell to end-user customers.

8. The Defendants refer to their contract distributors as "resellers" and these resellers will often in turn contract with sub-distributors referred to as "sub-resellers" by the Defendants.

9. From May 2011 until November 2012, Plaintiff served as a reseller for the Defendants under a Software Product Distribution Agreement and a Hardware Product Distribution Agreement (collectively "Agreements") entered into by and between Plaintiff and Separate Defendant Chaos Software Ltd. Pursuant to these Agreements, Plaintiff bought from the Defendants hundreds of blank USB licensing "dongles" shipped by the Defendants directly to Plaintiff.

10. Plaintiff marketed and sold the Defendants' V-RAY® products online through Plaintiff's website www.vray.com, and has continued to do so through the present day. When customers would place an order with Plaintiff, Plaintiff would then enter the order on Plaintiff's account within Defendants' reseller system. Defendants would then authorize and enable Plaintiff to download an active license

3

onto the corresponding USB dongle assigned by Defendants to the particular customer. Plaintiff would then ship the USB dongle to the customer who would then download the purchased software from the Defendants' web site.

11. After the reseller Agreements were terminated, Defendants authorized Plaintiff to continue selling Defendants' V-RAY® products as a sub-reseller, through one of Defendants' other resellers. Plaintiff has continued to sell Defendants' V-RAY® products under this arrangement through the present day.

12. In a letter from their attorney in June 2013, Defendants accused Plaintiff of operating its <vray.com> domain "in an attempt to unfairly capitalize on the valuable goodwill" Defendants have allegedly built in the mark V-RAY®. Defendants claimed that Plaintiff had committed trademark infringement and demanded that Plaintiff "immediately disable and transfer" the <vray.com> domain to Defendants.

13. Defendants' allegations were baseless. Plaintiff had purchased the <vray.com> domain in late 2008 from a third party and began developing the site as a platform from which to sell products. While the site was still under development, Plaintiff informed Defendants by email that Plaintiff (i) was entering the 3D software sales market, (ii) desired to become an authorized reseller of Defendants, and (iii) was developing its www.vray.com site to become a dedicated sales channel for software products.

14. Plaintiff completed Defendants' "Preliminary Reseller Questionnaire" and submitted it to Defendants in an effort to become one of their

resellers. Defendants responded by email with "applause and gratitude for creating the V-ray web-site." In fact, Defendants stated they were "glad to see your efforts and devotion in distributing and growing the popularity of our products" and even offered to send Plaintiff "materials for the web-site" if needed.

15.   Defendants further advised Plaintiff that they would like to see Plaintiff start first as a sub-reseller and then if sales, customer service and the web site development progressed appropriately over the requisite period of time, Defendants would authorize Plaintiff to serve as one of their resellers. Defendants promised they would also be willing to give bigger product discounts to those resellers who invest significant efforts and money into growing sales.

16.   In reliance on these assurances, Plaintiff devoted and expended enormous amounts of time, money and efforts developing www.vray.com and increasing V-RAY® sales sufficiently to become one of Defendants' resellers.

17.   Plaintiff kept Defendants informed as to its development of and success with www.vray.com over the years. On August 4, 2009, Plaintiff's President met personally with Peter Mitev, CEO of Chaos Software Ltd., in New Orleans, Louisiana at a trade convention and presented the entire vray.com website and its content and capabilities to Mr. Mitev on a laptop computer. Mr. Mitev never expressed any objections or concerns related to the website or Plaintiff's use and ownership of it.

18.   Throughout 2009 and 2010, and into 2011, Plaintiff continued to spend thousands of hours and dollars developing www.vray.com and increasing

5

sales of V-RAY® products in an effort to become approved as an authorized reseller of Defendants.

19. On May 26, 2011, the parties entered into the Software Product Distribution Agreement by which Plaintiff finally became an official reseller for Defendants.  See attached Exhibit 1.

20. On January 23, 2012, the parties also entered into the Hardware Product Distribution Agreement, further enhancing Plaintiff's reseller relationship. See attached Exhibit 2.

21. Given the massive amount of time, money and energy Plaintiff had invested in developing www.vray.com at the encouragement of Defendants and with their full knowledge, Plaintiff did not and has not complied with Defendants' demand to disable the site and transfer the <vray.com> domain to Defendants. Plaintiff continues to operate and sell Defendants' V-RAY® products at www.vray.com as of the present date.

22. Since the time Plaintiff declined to yield to Defendants' demand in 2013, Defendants have worked together, through a scheme designed to interfere with Plaintiff's existing and prospective business relations, to unlawfully attempt to substantially diminish Plaintiff's sales and to force Plaintiff to cease doing business altogether.  The Defendants are motivated by a desire to retaliate against Plaintiff for not capitulating to Defendants' demand for control of www.vray.com and to eventually gain ownership of the <vray.com> domain.

23. On October 15, 2013, a Software Support Specialist Aaron Hewett employed by the Defendants responded to one of the Plaintiff's customers, who was seeking technical support for V-RAY® products, and stated that Plaintiff is "not connected to [Defendants] in any way." See attached Exhibit 3. Mr. Hewett went on to tell the customer that he should contact the Plaintiff for any refund the customer would like and then blamed the Plaintiff for inconveniencing the customer. Id. Mr. Hewett's response states, in a very misleading fashion, that "Visual Dynamics is not an official reseller of our products" and strongly implies that only those companies appearing on the list he provided to the customer are authorized to sell the Defendants' V-RAY® products. Id.

24. In June of this year, another of Plaintiff's customers expressed frustration and confusion to Plaintiff arising from the fact that Plaintiff is not listed "as an authorized retailer" by Defendants on their web site www.chaosgroup.com. See attached Exhibit 4. More importantly, a representative of Defendants told the customer over the phone on June 20, 2016 that the Defendants could not assist her because Plaintiff "is not an authorized retailer." What is worse, Defendants' representative specifically suggested to the customer that she should cancel the charge (credit card charge-back) and buy the V-RAY® product through another company listed on Defendants' web site. Id.

25. In early September of this year, yet another of Plaintiff's customers contacted Defendants by phone and was told that Plaintiff was not authorized by Defendants to sell their products. This statement was designed to, and in fact did,

lead the customer to mistakenly believe that Plaintiff is selling Defendants' products without proper authority. Accordingly, this customer concluded the customer should not buy V-RAY® products from Plaintiff.

26. The aforementioned are only but a few examples of how Defendants have implemented and executed their scheme to interfere with Plaintiff's business relations and expectancies.

27. Plaintiff's customers and prospective customers are currently receiving, and have received at various times since no later than October 15, 2013, false and/or misleading information, orally and in writing, from Defendants' technical support and sales representatives intentionally designed to lead Plaintiff's customers and prospective customers to incorrectly believe that Plaintiff is not authorized to sell Defendants' products, that Plaintiff's customers should have their purchase money refunded from Plaintiff, and that neither Plaintiff's customers nor prospective customers should ever buy V-RAY® products from Plaintiff.

28. Defendants' website implies (and reinforces the above misrepresentations) that Plaintiff does not have the proper authority to sell Defendants' V-RAY® products because the website does not list Plaintiff as an approved sub-reseller nor does it explain that there are authorized sub-resellers in existence that are not listed on the site.

29. As a direct and proximate result of the Defendants' scheme and actions described herein, Plaintiff has lost significant business from existing customers and suffered a loss of other business from potential customers that is

nearly forcing Plaintiff out of business, which is the purpose of Defendants' conspiracy as set forth herein. Plaintiff continues to lose such business from Defendants' actions, which continue despite repeated and unanswered requests for relief made by Plaintiff to Defendants.

30. In addition to the monetary damages suffered by Plaintiff, Defendants' continued execution of their unlawful scheme has caused and will continue to cause, unless enjoined otherwise by this Court, incalculable, irrecoverable and irreparable harm to Plaintiff. Accordingly, Plaintiff will be unable to obtain an effective remedy at law for Defendants' wrongful conduct unless Defendants are enjoined from further tortious and other unlawful activities.

## COUNT I
## INTERFERENCE WITH BUSINESS EXPECTANCY

31. Plaintiff incorporates herein by reference paragraphs one (1) through thirty (30) of this Complaint.

32. Due to the volume of business that Plaintiff generated from 2008 through at least 2013 and the customer base Plaintiff established selling V-RAY® products through www.vray.com, as both a reseller and a sub-reseller, there was a reasonable business expectancy enjoyed by Plaintiff – an expectancy that reasonably included repeat business from customers and new business from prospective customers.

33. Defendants knew of Plaintiff's business expectancy as a result of their long history with doing business with the Plaintiff.

34. Defendants intentionally and maliciously interfered with Plaintiff's business expectancy, or otherwise knew or ought to have known that their conduct, in light of the surrounding circumstances, would naturally and probably result in damage to Plaintiff, and, nonetheless, the Defendants have continued such conduct in reckless disregard of the consequences from which malice may be inferred. Defendants systematically led Plaintiff's customers and prospective customers over the course of years that Plaintiff was not authorized to sell Defendants' products and that Plaintiff's customers should seek refunds from Plaintiff accordingly.

35. Defendants' misconduct has in fact induced or caused a breach or termination of the Plaintiff's business expectancy.

36. Plaintiff has suffered monetary damage as a direct and proximate result of Defendants' improper interference, disruption and cessation of Plaintiff's business expectancy, all for Defendants' unlawful purpose to cause such damage to Plaintiff.

37. Plaintiff's damages include, but are not limited to, past and future lost profits that would have been earned by Plaintiff but for Defendants' intentional and unlawful interference with Plaintiff's business expectancy.

38. The amount of damages Plaintiff has suffered will be proven at trial, but in any event, it is an amount, as to each such Defendant, that is in excess of the amount required for this Court to exercise jurisdiction over the subject matter of Plaintiff's claims.

## COUNT II
## CIVIL CONSPIRACY

39. Plaintiff incorporates herein by reference paragraphs one (1) through thirty-eight (38) of this Complaint.

40. Defendants have combined their efforts to divert business from Plaintiff by employing the means of providing, disseminating and/or publishing falsehoods, disparagements and/or misrepresentations that have misled Plaintiff's customers and prospective customers over the course of years into believing that Plaintiff was not and is not authorized to sell Defendants' products and that Plaintiff's customers should seek refunds from Plaintiff.

41. This conduct has resulted in Plaintiff's loss of its business relationships and business expectances from both existing customers and prospective customers.

42. Defendants' civil conspiracy has proximately caused Plaintiff to suffer compensatory damages, including past and future lost profits and incidental and consequential damages, in an amount to be determined at trial, but in any event, an amount, as to each such Defendant, in excess of the amount required for this Court to exercise diversity jurisdiction over the subject matter of Plaintiff's claims.

## COUNT III
## PRELIMINARY INJUNCTION

43. Plaintiff incorporates herein by reference paragraphs one (1) through forty-two (42) of this Complaint.

11

44. Plaintiff's Complaint against the Defendants is for tortious interference with business expectancy and civil conspiracy, and Plaintiff will likely succeed on the merits of these claims.

45. If a preliminary injunction is not granted, Plaintiff will suffer irreparable harm because Defendants will continue directing business away from Plaintiff, and Plaintiff will be unable to salvage or reclaim the lost business due to the fact that it will have insufficient knowledge of which of its customers and/or prospective customers have declined to do business with Plaintiff as a result of misrepresentations made to them by Defendants about Plaintiff.

46. The balance of equities in this case tips in favor of Plaintiff because it would be unconscionable to allow the Defendants to intentionally divert business from Plaintiff through unlawful means and with an unlawful purpose without any recourse available to Plaintiff.

47. To avoid Plaintiff suffering a wrong without a remedy, and, otherwise, irreparable harm, this Court should enjoin Defendants from providing, disseminating or otherwise publishing to third parties false and/or misleading information concerning Plaintiff's authority to sell Defendants' products and from directing Defendants' resellers to cease doing business with Plaintiff.

48. The preliminary injunction should be entered and remain effective until this case is resolved on the merits.

49. Plaintiff demands a jury trial of all claims and matters asserted herein that may be tried to a jury.

WHEREFORE, Plaintiff Visual Dynamics, LLC, requests that:

A. This Court enter judgment in its favor against Defendants Chaos Group, LLC and Chaos Software Ltd. for an award of damages, plus prejudgment interest, post-judgment interest, the costs and expenses incurred by Plaintiff to prosecute this action, and exemplary damages, all of which are to be proven at trial;

B. This Court enter a preliminary injunction against the Defendants that restrains them from providing, disseminating or otherwise publishing to third parties false and/or misleading information concerning Plaintiff's authority to sell Defendants' products and from directing Defendants' resellers to cease doing business with Plaintiff; and

C. This Court grant it all other just and proper relief to which it is entitled.

Respectfully submitted,

**VISUAL DYNAMICS, LLC**

By its attorney,

By: _____
W. Asa Hutchinson III
Arkansas Bar #2001115
The Asa Hutchinson Law Group, PLC
210 SE 34th Street, Suite 2
Bentonville, AR 72712
Phone: (479) 878-1600
Facsimile: (479) 876-8283
Email: ahutchinson@ahlawgroup.com

13