IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

VISUAL DYNAMICS, LLC                                          **PLAINTIFF/**
                                                   **COUNTER-DEFENDANT**

V.                                    **CASE NO. 5:16-CV-5287**

CHAOS SOFTWARE LTD. and                                  **DEFENDANTS/**
CHAOS GROUP, LLC                                   **COUNTER-CLAIMANTS**

## MEMORANDUM OPINION AND ORDER

Currently before the Court are:

- Defendants/Counter-Plaintiffs Chaos Software Ltd.'s and Chaos Group, LLC's (collectively, "Chaos") Motion for Summary Judgment against Plaintiff/Counter-Defendant Visual Dynamics, LLC's ("Visual Dynamics") Claims (Doc. 22), Brief in Support (Doc. 24), and Statement of Undisputed Material Facts in Support (Doc. 26); Visual Dynamics' Response in Opposition (Doc. 40-1), Brief in Support (Doc. 41-1), and Statement of Disputed Facts in Support (Doc. 42-1); and Chaos's Reply Brief in Support of its Motion (Doc. 43);

- Chaos's Motion for Summary Judgment on its Counterclaims (Doc. 23), Brief in Support (Doc. 25-1), and Statement of Undisputed Material Facts in Support (Doc. 26); Visual Dynamics' Response in Opposition (Doc. 37-1), and Statement of Disputed Facts in Support (Doc. 42-1); and Chaos's Reply Brief in Support of its Motion (Doc. 44); and

- Visual Dynamics' Motion for Summary Judgment as to Chaos's Counterclaims (Doc. 28), Statement of Undisputed Facts in Support (Doc. 30), and Brief in

1

Support (Doc. 31); Chaos's Response in Opposition (Doc. 35), and Response in Opposition to Visual Dynamics' Statement of Undisputed Facts (Doc. 36); and Visual Dynamics' Reply Brief in Support of its Motion (Doc. 46-1).

As further explained below, Chaos's Motion with respect to Visual Dynamics' claims is **GRANTED**, Chaos's Motion with respect to its own claims is **GRANTED IN PART AND DENIED IN PART**, and Visual Dynamics' Motion is **GRANTED IN PART AND DENIED IN PART**.

## I. BACKGROUND

Chaos is a Bulgarian software developer that was founded in 1997. One of its products is a rendering software application that is sold under the "V-Ray" name and mark, which was first registered with the United States Patent and Trademark Office ("USPTO") on March 20, 2007. V-Ray is used to create realistic graphics and animation in a variety of industries, including video games, film and television, and architecture design. But Chaos does not sell V-Ray directly to the public; instead, it sells the product to a network of "authorized resellers," who in turn resell the product to the general public. Sometimes those resellers distribute the product to "sub-resellers," who then sub-resell it to the general public. Chaos contracts with its resellers, but it does not contract with sub-resellers. However, its contracts with its resellers require them to demand certain things of their sub-resellers, such as pricing limits.

Visual Dynamics is an Arkansas business that resells software from outside developers. In September of 2008, Visual Dynamics' owner, Scott Slauson, purchased the internet domain name registration for www.vray.com from a man named Vance Ray for $4,000, in anticipation of using vray.com to sell V-Ray products in the United States

as one of Chaos's authorized resellers. After purchasing the vray.com domain, Mr. Slauson approached Chaos on behalf of Visual Dynamics, asking whether Chaos would make Visual Dynamics one of its authorized resellers. Chaos declined, explaining that it already had seven authorized resellers in the United States, and didn't want to oversaturate the American market or dilute its brand there. However, Chaos encouraged Visual Dynamics to go ahead and seek out one of its authorized resellers in order to become a sub-reseller of V-Ray products. Visual Dynamics did this, and sub-resold V-Ray products on vray.com, with Chaos's knowledge, from 2008 until May 26, 2011, when it finally became an authorized reseller of V-Ray products for Chaos.

The relationship between Visual Dynamics and Chaos was a complicated and frustrating one for both parties. On the one hand, Visual Dynamics made money for Chaos, and of course, for itself. On the other hand, Chaos experienced frequent complaints from customers about Visual Dynamics' customer service, and about the vray.com website. Eventually, Chaos had enough, and on October 11, 2012, Chaos terminated the parties' authorized-reseller relationship, effective on November 9, 2012. However, Visual Dynamics continued *sub*-reselling V-Ray products on vray.com. Then on June 3, 2013, Visual Dynamics was hit with a letter from Chaos's attorneys, demanding that it cease using the V-Ray mark and immediately turn over the registration of the vray.com domain to Chaos. Visual Dynamics declined, and instead continued sub-reselling V-Ray products on vray.com.

For the next three and a half years, an uneasy truce of sorts seems to have held between the parties. Chaos complained to consumers and to the public about Visual Dynamics and vray.com, and went out of its way to emphasize to anyone with questions

about the matter that the two entities were not affiliated with each other. But Chaos took no legal action to follow up on its 2013 cease-and-desist letter. Mr. Slauson, however, fumed over the things Chaos was saying about Visual Dynamics to others, and on October 14, 2016, crossed the Rubicon by filing this lawsuit, claiming that Chaos was tortiously interfering with Visual Dynamics' business expectancy. In addition to that claim of tortious business interference, Visual Dynamics also asserted claims against Chaos for civil conspiracy and for a preliminary injunction, both of which were premised on the same conduct as the first claim. Chaos was apparently displeased with this turn of events, and responded by filing nine counterclaims against Visual Dynamics for trademark infringement, trademark dilution, false representation, false designation of origin, unfair competition, cyberpiracy, and deceptive trade practices, under various theories of federal and Arkansas law.

On October 30, 2017, the parties filed their summary judgment motions. Chaos filed two motions: one seeking summary judgment on its own claims against Visual Dynamics, and the other seeking dismissal of Visual Dynamics' claims against Chaos. Visual Dynamics filed one motion, seeking dismissal of Chaos's claims. All three of those motions are now ripe for adjudication. Trial of whatever claims survive these motions is set to begin on February 20, 2018. A final pretrial conference will be held tomorrow, February 13.

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When, as here, cross-motions for summary judgment are

filed, each motion should be reviewed in its own right, with each side "entitled to the benefit of all inferences favorable to them which might reasonably be drawn from the record." *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983). The Court must view the facts in the light most favorable to the non-moving party, and give the non-moving party the benefit of any logical inferences that can be drawn from the facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1997). The moving party bears the burden of proving the absence of any material factual disputes. Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

If the moving party meets this burden, then the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting then-Fed. R. Civ. P. 56(e)). These facts must be "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmoving party must do more than rely on allegations or denials in the pleadings, and the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986)).

### III. DISCUSSION

The Court is of the opinion that there can be no reasonable dispute as to certain facts in this case, regardless of whether the record is viewed in the light most favorable to Chaos or to Visual Dynamics. So before diving into the specific elements of any

5

particular claim or defense by either party, it is useful to make certain factual findings and legal rulings flowing therefrom, that will have the effect of dramatically streamlining the analysis that follows.

Chaos does not claim that it is unlawful for Visual Dynamics to sub-resell V-Ray products. *See, e.g.*, Doc. 35, p. 5. And there is no reasonable dispute that Chaos gave Visual Dynamics permission to use the V-Ray logo in connection with the sale of V-Ray products, long before Visual Dynamics became an authorized reseller. *See* Doc. 28, p. 27. There is also no reasonable dispute that, long before Visual Dynamics became an authorized reseller, Chaos not only *permitted* Visual Dynamics to use the vray.com domain, but even *encouraged* Visual Dynamics to sell V-Ray products *on the vray.com domain*. *See id.* at 10–17, 27. True, Chaos conditioned this permission and encouragement on Visual Dynamics's compliance with requests, for example, that the vray.com domain explain that it was not Chaos's property, that it explain that it was not connected with Chaos, and that it not use any Chaos Software logos. *See id.* at 27. But there is no evidence in the record that Visual Dynamics ever failed to comply with such requests at any point from when the two companies first communicated, all the way through the time when Chaos terminated its authorized-reseller contracts.

Given all of this, the Court finds that long before Visual Dynamics became an authorized V-Ray reseller for Chaos, Chaos had already given Visual Dynamics a license to use the V-Ray mark in marketing and advertising materials for the sale of V-Ray products on the vray.com website. Although it would seem to be the better practice for a trademark license to take the form of a written contract, this is not the only means by which a license may arise. A trademark license can also arise through a course of

6

conduct that clearly indicates to a reasonable observer in the implied licensee's position that the holder of the trademark has consented to a particular type of use of that mark by the licensee. *See* Restatement (Third) of Unfair Competition § 29 & comments a, c (1995). And that is what happened here, long before Visual Dynamics ever became an authorized V-Ray reseller for Chaos.

However, whatever the precise scope of that prior license may have been, it merged into and was superseded by the written contracts that governed these parties' authorized-reseller relationship from May 26, 2011 to November 9, 2012. That is because these contracts were, among other things, written licensing agreements. They explicitly authorized Visual Dynamics to use the V-Ray logo and Chaos's marketing materials in advertising the product, *see* Doc. 1-1, ¶ 1.4; Doc. 1-2, ¶ 1.3, and they exerted quality control by requiring Visual Dynamics to immediately inform Chaos about trademark-related issues, *see* Doc. 1-1, ¶ 4.11; Doc. 1-2, ¶ 4.10, authorizing Visual Dynamics to take legal action to protect Chaos's intellectual property, *see* Doc. 1-1, ¶ 12, and by requiring Visual Dynamics to stop distributing and advertising V-Ray products when the agreements were terminated, *see* Doc. 1-1, ¶ 14; Doc. 1-2, ¶ 12; *see also* 3 McCarthy on Trademarks and Unfair Competition §§ 18:38, 18:42 (5th ed.) (discussing importance of quality control for trademark licensing). So under the so-called "merger rule," any prior license that Visual Dynamics held with respect to the V-Ray trademark merged into the written authorized-reseller license *and was terminated when the reseller contract was terminated. See Hot Stuff Foods, LLC v. Mean Gene's Enters., Inc.*, 468 F. Supp. 2d 1078, 1095 (D.S.D. 2006); 4 McCarthy on Trademarks and Unfair Competition § 25:32

(5th ed.).[1]   And there is no reasonable dispute that on October 11, 2012, Chaos terminated the reseller contract, effective on November 9, 2012. *See* Doc. 23-2, p. 4.

Chaos indisputably took *some* steps to protect its intellectual property as soon as it terminated the reseller contract, by demanding that Visual Dynamics post new and more prominent disclaimers on vray.com, explaining the lack of affiliation between Visual Dynamics and Chaos. *See id.* Visual Dynamics complied with these demands. *See* Doc. 28, p. 36.[2] However, Visual Dynamics continued selling V-Ray products on vray.com as a *sub*-reseller, just as it had done for many years before becoming an authorized reseller. *See id.*

As previously mentioned in Section I, *supra*, on June 3, 2013, roughly seven months after Chaos's termination of its authorized-reseller contract with Visual Dynamics took effect, Chaos's attorneys sent Visual Dynamics a letter citing "potential consumer confusion," demanding that Visual Dynamics immediately cease and desist from any further use whatsoever of the V-Ray mark, and further demanding that Visual Dynamics hand over the vray.com domain to Chaos within fourteen days—apparently in exchange

---

[1] Importantly, this rule's application is grounded not in the existence of any particular contractual "merger clause," but rather in more general principles of trademark law itself. The idea here is that when a licensee contractually acknowledges a trademark holder's superior rights in that mark, it is inconsistent for the licensee to later argue, after the license terminates, that he or she has any preexisting rights in the mark's use that are superior to those of the trademark's owner. *See Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.*, 88 F. Supp. 2d 914, 923 (C.D. Ill. 2000); *cf. A & L Labs., Inc. v. Bou-Matic LLC*, 429 F.3d 775, 781 (8th Cir. 2005) ("If A & L had owned the trademarks, it would not have needed DEC's permission to use them.").

[2] Chaos points to one instance of alleged noncompliance: a particular page on vray.com from October 29, 2014 on which the disclaimers were not posted. *See* Doc. 23-2, p. 29. But this page was not one of the pages on which Chaos asked the disclaimers to be posted, *see id.* at 4, so the Court finds that this was not an instance of noncompliance by Visual Dynamics.

8

for no compensation at all from Chaos. *See* Doc. 23-2, pp. 56–57. The Court would observe here that, at least as a general proposition, trademark law is quite clear that continued use of a mark by a former licensee after a license has been terminated constitutes trademark infringement. *See* 4 McCarthy on Trademarks and Unfair Competition § 25:31 (5th ed.) ("Once a . . . license contract is terminated, there is no doubt that the former . . . licensee has no authorization or consent to continue use of the mark.") (collecting cases). This is because the risk of customer confusion is especially high when the entity using the mark once did so with the explicit and widely-known authorization of the mark's owner but no longer has permission to do so. *See id.* On the other hand, one who is looking past the letter of the law to the equities of the situation might justifiably raise an eyebrow over Chaos's decision to let seven months pass before making this demand. *Cf. Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (declining to enter preliminary injunction in favor of claimant who waited to file suit until nine months after receiving notice in the press and ten weeks after receiving actual notice of alleged wrong). But at any rate, Visual Dynamics felt this to be an unfair and unreasonable demand, and declined to accommodate it. *See* Doc. 37-1, pp. 13–14.

Certainly, what transpired next is far more eyebrow-raising: as already noted, another three and a half years passed with Chaos taking no legal action to enforce or follow up on its demand. Visual Dynamics simply continued sub-reselling V-Ray products from vray.com. In the meantime, Chaos contented itself to deal with confused or frustrated consumers on an *ad hoc* basis, by telling them that Visual Dynamics was not affiliated with Chaos, *see* Doc. 40-1, p. 45, that Visual Dynamics was not an official reseller of V-Ray products, *see id.*, that Chaos does not trust Visual Dynamics and was

unable to obtain the vray.com domain from them, *see id.* at 48, that if a customer who purchased a V-Ray product from Visual Dynamics wants a refund, then he or she must seek the refund from Visual Dynamics, *see* Doc. 23-2, pp. 7–8, and that Chaos could not help customers with problems they might have using the vray.com website, *see* Doc. 45, pp. 3–4, 11–12. Visual Dynamics took umbrage at even this much interference by Chaos, *see* Doc. 41-1, pp. 2–5, and eventually decided that instead of letting sleeping dogs lie, it would poke the bear by filing this lawsuit. Only then did Chaos take legal action to enforce its demand of several years ago, by asserting its nine counterclaims in this case.

Given all of the foregoing context, this is an appropriate place for the Court to make three especially important findings. *First*, it was not improper for Chaos to say these things about its relationship or lack thereof with Visual Dynamics. This is so for the rather obvious reason that all of these statements were *true* and in furtherance of Chaos's legitimate self-interest. *See* Restatement (Second) of Torts § 767. Visual Dynamics is *not* affiliated with Chaos. Visual Dynamics is *not* an authorized reseller of V-Ray products.[3] Chaos does *not* trust Visual Dynamics. Chaos is *not* able to "refund" a transaction to which it was not a party. Chaos does *not* own vray.com, and therefore Chaos is *not* able to help customers resolve any technical problems they might have using

---

[3] Visual Dynamics' contention to the contrary in a summary judgment response brief beggars belief. *See* Doc. 41-1. Chaos's termination of Visual Dynamics' reseller agreements speaks for itself, *see* Doc. 23-2, p. 4, such that even Visual Dynamics previously admitted in this litigation that it is no longer one of Chaos's authorized resellers, *see* Doc. 23-2, pp. 305–06. The only evidence on which Visual Dynamics belatedly relies to support the opposite notion is accurately characterized by Chaos as "an email from a Chaos employee . . . in Bulgaria who clearly speaks limited English, responding to a customer in Saudi Arabia who is confused about who owns the vray.com website and happens to use the phrase 'authorized reseller' when referring to vray.com." *See* Doc. 43, p. 5 (citing Doc. 45, pp. 6–7).

that website. And there is nothing improper about Chaos encouraging potential V-Ray customers to purchase V-Ray products only from authorized resellers; rather, this is simply an entirely reasonable attempt by Chaos to protect its own brand. *Cf. Fisher v. Jones*, 311 Ark. 450, 458–59 (1993) (not improper for party to direct business to someone other than its former franchisee).

*Second*, there is no reasonable dispute that Visual Dynamics' use of the V-Ray mark is likely to, and actually does, cause confusion and mislead consumers. Chaos has presented evidence of numerous *actual* instances of customer confusion and frustration over whether Visual Dynamics and the vray.com website are affiliated with Chaos, *see* Doc. 23-2, pp. 219–22, 224, 229–30, 262–71, and Visual Dynamics has not presented any evidence to rebut this. Various specific instances of such confusion and frustration will be discussed further below, as appropriate.

*Third*, there is no reasonable dispute that Visual Dynamics knew or should have known, after June 3, 2013, that its use of the V-Ray mark on vray.com was likely to cause confusion and mislead consumers as to whether Visual Dynamics was an authorized reseller of V-Ray products and as to whether vray.com was affiliated with Chaos. Although it is true that Visual Dynamics prominently placed disclaimers on vray.com explaining the lack of any affiliation between vray.com and Chaos, it is *also* true that after Visual Dynamics was no longer an authorized reseller of V-Ray products, it continued to refer to itself on vray.com's "about us" page as "a reseller," *see* Doc. 23-2, p. 35, and continued to send emails to Visual Dynamics customers that contained Chaos's marketing materials or the V-Ray logo without any accompanying disclaimers about the lack of affiliation between the two entities, *see, e.g.*, *id.* at 32, 34. Any reasonable person

in Visual Dynamics' position would expect such conduct inevitably to result in some amount of customer confusion over Chaos's relationship with vray.com and Visual Dynamics—especially given that Visual Dynamics had formerly been an authorized reseller of V-Ray products. The existence of the disclaimers on certain pages of vray.com does not change this, because "a disclaimer does not serve to cure an otherwise clear case of likelihood of confusion." *Bd. of Trs. of Univ. of Ark. v. Prof'l Therapy Servs., Inc.*, 873 F. Supp. 1280, 1292 (W.D. Ark. 1995) (quoting 2 McCarthy on Trademarks and Unfair Competition, § 23.15 (3d ed. 1993)).

With the foregoing discussion out of the way, the table is now set for an efficient march through each party's particular claims and defenses. The Court will begin with Visual Dynamics' claims against Chaos, on which Chaos has moved for summary judgment. Then, the Court will take up Chaos's claims against Visual Dynamics, on which the parties have filed cross-motions for summary judgment. There, the Court will first consider Chaos's claims themselves, and then the Court will consider Visual Dynamics' asserted defenses against those claims.

## A. Visual Dynamics' Claims against Chaos

As mentioned in Section I of this Opinion and Order, *supra*, Visual Dynamics' Complaint sets forth three counts against Chaos: (1) tortious interference with business expectancy; (2) civil conspiracy; and (3) preliminary injunction. But we are of course well past the stage for preliminary injunctions in this lawsuit, so only the first two counts are still live at this point.

As for the tort of interference with business expectancy, it has four elements: (1) that Visual Dynamics had a valid business expectancy; (2) that Chaos had knowledge of

12

that business expectancy; (3) that Chaos intentionally and improperly interfered with, or induced or caused a disruption or termination of, that business expectancy; and (4) that the interference, disruption, or termination of that business expectancy proximately caused damage to Visual Dynamics. *See Constr. Mgmt. and Inspection, Inc. v. Caprock Commc'ns Corp./Caprock Telecomms. Corp.*, 301 F.3d 939, 941 (8th Cir. 2002). Visual Dynamics' claim for this tort is premised on Chaos's statements to V-Ray customers that were described in the preceding subsection of this Opinion and Order. But the Court found above that there was nothing improper about any of those statements. Therefore it is impossible for Visual Dynamics to satisfy the third element of this tort; accordingly, summary judgment for Chaos is proper on this claim.

From this it follows that summary judgment for Chaos is also proper on Visual Dynamics' civil conspiracy claim. Under Arkansas law, civil conspiracy "is not actionable in and of itself," but rather, must be predicated on injury suffered from some additional wrongful conduct committed pursuant to the conspiracy. *See Dodson v. Allstate Ins. Co.*, 345 Ark. 430, 445 (2001). But here, the only conduct alleged to have been committed in furtherance of the conspiracy is the very conduct that the Court just held in the preceding paragraph was not improper. *See* Doc. 1, ¶¶ 40–42. Lacking any other independent grounds, the claim for civil conspiracy must be dismissed. *See Strack v. Capital Servs. Grp., LLC*, 2006 WL 14507, at \*6 n.4 (Ark. Ct. App. Jan. 4, 2006) (unpublished) (limiting reinstatement of civil conspiracy claim on remand "to the extent that it might be supported by [plaintiff]'s primary cause of action for insurance fraud").

To recap, then: summary judgment in favor of Chaos is proper on all of Visual Dynamics' claims. Accordingly, Chaos's Motion for Summary Judgment against Visual

Dynamics' Claims (Doc. 22) will be **GRANTED**, and Visual Dynamics' claims will be **DISMISSED WITH PREJUDICE**.

### B. Chaos's Claims against Visual Dynamics

The Court turns now to Chaos's claims against Visual Dynamics. First, the Court will consider whether Chaos has met its burden on summary judgment of satisfying each element of each such claim. Then, the Court will consider the applicability of Visual Dynamics' defenses to each of Chaos's claims.

### 1. The Elements of Chaos's Claims

As previously mentioned, *see* Section I, *supra*, Chaos has asserted nine counterclaims against Visual Dynamics: (1) statutory trademark infringement in violation of 15 U.S.C. § 1114(1)(a); (2) federal unfair competition, false representation, and false designation of origin in violation of 15 U.S.C. § 1125(a); (3) federal trademark dilution in violation of 15 U.S.C. § 1125(c); (4) federal anti-cyberpiracy in violation of 15 U.S.C. § 1125(d); (5) statutory trademark infringement in violation of Ark. Code Ann. § 4-71-212; (6) trademark infringement in violation of Arkansas common law; (7) trademark dilution in violation of Ark. Code Ann. § 4-71-213; (8) deceptive trade practices in violation of Ark. Code Ann. § 4-88-101 *et seq.* (the Arkansas Deceptive Trade Practices Act, or "ADTPA"); and (9) unfair competition in violation of Arkansas common law. In Chaos's Motion for Summary Judgment on these claims, it groups them into four categories—a grouping to which this Opinion and Order will also adhere. The first category consists of claims 1, 2, 5, 6, and 9. The second category consists of claim 4. The third category consists of claims 3 and 7. And the fourth category consists of claim 8. The Court will now consider each of these categories in that sequence.

### a. Claims 1, 2, 5, 6, and 9—trademark infringement, unfair competition, false representation, and false designation of origin under federal and Arkansas law

The Lanham Act makes it unlawful for any person to use a registered trademark "in connection with the sale, offering for sale, distribution, or advertising of any goods or services" in a manner that "is likely to cause confusion, or to cause mistake, or to deceive" consumers, without the consent of the registrant. *See* 15 U.S.C. § 1114(1)(a). Similarly, it also declares unlawful the commercial use of "any word, term, name, symbol, . . . false designation of origin, false or misleading description of fact, or false or misleading representation of fact" that "is likely to cause confusion, . . . mistake, or to deceive as to the affiliation, connection, or association of" the person making such use "with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." *See id.* at § 1125(a)(1)(A). The Arkansas trademark infringement statute tracks the Lanham Act nearly word-for-word, except that it requires the mark in question to be registered with the Arkansas Secretary of State. *See* Ark. Code Ann. § 4-71-212(1). But otherwise, the "Arkansas law of trademarks, trade names and unfair competition is in accord with the general law," *Gaston's White River Resort v. Rush*, 701 F. Supp. 1431, 1435 (W.D. Ark. 1988). Indeed, Arkansas courts define "unfair competition," as "the simulation by one person, for the purpose of deceiving the public, of the names, symbols or devices employed by a business rival . . . thereby obtaining for such person the benefits properly belonging to such person's competitor," which can be established by showing "a course of dealing which leads, or is likely to lead, consumers into believing that the goods or services of one supplier are those of another." *See id.* (quoting *Esskay Art Galleries v. Gibbs*, 205 Ark. 1157 (1943)) (omissions in original).

In other words—with one caveat to which the Court will return at the end of this subsection—a claimant may establish violations of *all* of 15 U.S.C. § 1114(1)(a), 15 U.S.C. § 1125(a)(1)(A), Ark. Code Ann. 4-71-212, Arkansas common-law trademark infringement, and Arkansas common-law unfair competition, simply by proving both of the following elements: "(1) that it owns a valid, protectable mark; and (2) that there is a likelihood of confusion between its mark and [the] defendant's mark." *Cf. Am. Auto Ass'n, Inc. v. Advance Quotes, LLC*, 2010 WL 2985505, at *3 (W.D. Ark. June 29, 2010) (citing *B & B Hardware, Inc. v. Hargis Indus.*, 569 F.3d 383, 389 (8th Cir. 2009)). And that is exactly what Chaos has established here. There is no dispute that Chaos's V-Ray mark is validly registered with the USPTO. And the Court has already found earlier in Section III of this Opinion and Order, *supra*, that Visual Dynamics' use of the V-Ray mark is likely to, and actually does, cause confusion and mislead consumers.

But to briefly elaborate now on that finding—the Eighth Circuit considers the following factors when evaluating the likelihood of confusion:

> 1) the strength of the [claimant]'s mark; 2) the similarity between the [claimant]'s and defendant's marks; 3) the degree to which the allegedly infringing product competes with the [claimant]'s goods; 4) the alleged infringer's intent to confuse the public; 5) the degree of care reasonably expected of potential customers[;] and 6) evidence of actual confusion.

*Roederer v. J. Garcia Carrion, S.A.*, 569 F.3d 855, 860 (8th Cir. 2009). But "no one factor controls, and because the inquiry is inherently case-specific, different factors may be entitled to more weight in different cases." *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1054 (8th Cir. 2005). Here, as already noted above, it is indisputable that actual confusion has resulted from Visual Dynamics' use of the V-Ray mark. And as already noted above, any reasonable person in Visual Dynamics' position should have anticipated

16

that some confusion would result. The marks in question are not only extremely similar, but typically textually identical; "vray.com" versus "V-Ray" is about as wide as any divergence between the two ever gets, and of course both are clearly and intentionally understood to refer to the same product. And given that the same product is referred to by both Visual Dynamics' and Chaos's use of the V-Ray mark, the first and third factors are simply unimportant or inapplicable here.

To reiterate, then: there is no material dispute that Chaos's V-Ray mark is valid and protectable, and that Visual Dynamics' use of that mark has resulted, and is likely to result, in confusion by the ordinary consumer. Thus, Chaos has satisfied every element of Counts 1, 2, 6, and 9 of its Counterclaim. But now for the caveat referenced two paragraphs earlier: Chaos has not shown that its V-Ray mark is registered with the Arkansas Secretary of State, so it has not satisfied every element of Count 5, and is not entitled to summary judgment on that particular claim.

### b. Claim 4—federal cyberpiracy

The Court turns now to Chaos's claim for cyberpiracy. Federal law declares that a person shall be liable to a trademark owner if that person: "(i) has a bad faith intent to profit from [the owner]'s mark," and "(ii) registers, traffics in, or uses a domain name that . . . in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark." *See* 15 U.S.C. § 1125(d)(1)(A)(i), (ii)(I). There is of course no dispute that Visual Dynamics uses the domain name "vray.com," and that Visual Dynamics registered that domain name after Chaos registered its V-Ray mark with the USPTO. *See* Doc. 23-2, pp. 43–46. And as has already been discussed in this Opinion and Order, that domain name is confusingly similar to the V-Ray mark.

The only remaining question, then, is whether Visual Dynamics "has a bad faith intent to profit from that mark." *See* 15 U.S.C. § 1125(d)(1)(A)(i).

The statute sets out a non-exhaustive list of factors which the Court "may consider" when determining whether Visual Dynamics "has a bad faith intent." *See id.* at § 1125(d)(1)(B)(i). However, the statute also states that "bad faith intent . . . shall not be found in any case in which the court determines that the person believed *and* had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." *Id.* at § 1125(d)(1)(B)(ii).

The Court finds that regardless of whatever Visual Dynamics actually believed, it had no reasonable grounds to believe that its use of the domain name was a fair use or otherwise lawful after receiving the June 3, 2013 demand letter. As previously noted, Visual Dynamics referred to itself as "a reseller" on the vray.com "about us" page, despite no longer being authorized by Chaos to resell V-Ray products. And the Court has already observed several times in this Opinion and Order that any reasonable person in Visual Dynamics' position should have anticipated that confusion would result from its use of the V-Ray mark on vray.com—which is to say that in the absence of Chaos's consent, any reasonable person in that position should have anticipated that this use would constitute trademark infringement.

Looking then to the list of factors in § 1125(d)(1)(B)(i), the Court finds that the pertinent ones weigh so heavily in favor of a finding of bad faith that there can be no material dispute that Visual Dynamics' use of vray.com has been characterized by it. Visual Dynamics has no trademark or other intellectual property rights in the domain name. *See id.* at § 1125(d)(1)(B)(i)(I). The domain name consists entirely of Chaos's V-

Ray mark. *Cf. id.* at § 1125(d)(1)(B)(i)(II). Prior to Chaos's termination of its reseller agreement, Visual Dynamics used the domain for the good faith offering of V-Ray products, *see id.* at § 1125(d)(1)(B)(i)(III), (IV), but as discussed above, that very history made consumer confusion and trademark infringement an inevitable result of its continued commercial use of the vray.com domain to sell V-Ray products after the reseller agreement was terminated. The V-Ray mark is indisputably famous (more will be said on this point in the following subsection regarding trademark dilution). *See id.* at § 1125(d)(1)(B)(i)(IX). Visual Dynamics' owner, Mr. Slauson, has previously registered or acquired multiple other domain names that he knows are identical or confusingly similar to marks of others and that are distinctive at the time of registration, *see id.* at § 1125(d)(1)(B)(i)(VIII)—specifically, domain names containing trademarks registered by a software company called Autodesk, *see* Doc. 23-2, pp. 82, 85–87. And as has already been described numerous times above, Visual Dynamics uses vray.com "to divert consumers . . . to a site accessible under the domain name . . . for commercial gain . . . by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site." *Cf.* 15 U.S.C. § 1125(d)(1)(B)(i)(V). In sum, Chaos has satisfied all of the elements for its claim of federal cyberpiracy.

### c. Claims 3 and 7—trademark dilution under federal and Arkansas law

Shifting now to Chaos's claims for trademark dilution: federal law provides that "the owner of a famous mark that is distinctive . . . shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of

actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1). Arkansas law provides likewise, with the relevant statute once again substantively tracking the federal one with respect to all these elements,[4] except that the Arkansas statute requires actual dilution rather than its mere likelihood. *See* Ark. Code Ann. § 4-71-213(a)(1).

The V-Ray mark is indisputably famous. As has already been discussed, it is registered with the USPTO. *See* 15 U.S.C. § 1125(c)(2)(A)(iv). Total V-Ray sales worldwide in 2016 were nearly $10 million, *see* Doc. 23-2, p. 295, and Mr. Slauson readily admits the software's popularity, *see id.* at 154. *See* 15 U.S.C. § 1125(c)(2)(A)(i)–(iii); *see also* Ark. Code Ann. § 4-71-213(a)(2). Chaos's cofounder has even won an Academy Award for V-Ray's use in several blockbuster movies. *See* Doc. 23-2, p. 257. And although V-Ray was not winning Academy Awards when Visual Dynamics "commence[d] use of" the V-Ray mark, 15 U.S.C. § 1125(c)(1), it was indisputably famous then too. When Mr. Slauson was negotiating the purchase of the vray.com domain from Vance Ray, he explained to Mr. Ray that V-Ray software was "very popular and a strong seller." *See* Doc. 23-2, p. 18. And Mr. Slauson testified that it "didn't take long for everybody to hear about" V-Ray, *see id.* at 149, when the product first hit the market, *see id.* at 148–50.

---

[4] Unlike the federal statute, the Arkansas statute also permits an award of monetary damages, "subject to the discretion of the court and the principles of equity," if it is also proven that "the person against whom the injunctive relief is sought willfully intended to trade on the [mark] owner's reputation or to cause dilution of the famous mark." *See* Ark. Code Ann. §§ 4-71-213(b), 4-71-214(a)(2). For reasons that will become clear in Section III.B.2 *infra*, the Court will not reach the question of whether there is any material factual dispute as to the establishment of this additional element.

The federal statute defines "dilution by tarnishment" as "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark," 15 U.S.C. § 1125(c)(2)(C), and "dilution by blurring" as "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark," *id.* at § 1125(c)(2)(B). The Arkansas statute, on the other hand, simply refers to "dilution" without reference to any specific type of dilution, such as blurring or tarnishment, *see* Ark. Code Ann. § 4-71-213(a)(1). Instead, it defines "dilution" as meaning "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of: (A) Competition between the owner of the famous mark and other parties; or (B) A likelihood of confusion, mistake, or deception." Ark. Code Ann. § 4-71-201(3).

Chaos's summary judgment motion focuses on the issue of whether its V-Ray mark is "famous," and does not specify whether it is proceeding under a theory of tarnishment, blurring, or both. *See* Doc. 25-1, pp. 15–19. But it is easy for the Court to see there is no material dispute of fact that Visual Dynamics' use of the V-Ray mark is likely to cause dilution by tarnishment. Chaos has placed abundant unrebutted evidence in the record that Visual Dynamics' use of the V-Ray mark is not only *likely* to harm that mark's reputation, but actually *has* done so, at least to some significant extent. Consumers have emailed Chaos, assuming that or questioning whether vray.com is an official Chaos website, and complaining that their experience with vray.com and Visual Dynamics was "confusing," "inconvenient," "a user experience nightmare," and "misleading," *see* Doc. 23-2, pp. 219–20, 222, and telling *Chaos* things like "*[y]ou* should have one link . . . [w]hy would *you* want to make my brain explode?," *see id.* at 224

(emphasis added), or "I . . . personally don't appreciate the 'smart ass' comments . . . I am not comfortable purchasing/doing business with *your* company," *see id.* at 226 (emphasis added). Similarly, there is no material dispute of fact that Visual Dynamics has caused a lessening of the V-Ray mark's capacity to distinguish between services, given the unrebutted evidence that Chaos has received repeated customer complaints about technical problems with the vray.com website that Chaos has no capacity to address, *see* Doc. 45, pp. 3–4, 11–12, and that consumers sometimes incorrectly believed that Visual Dynamics, rather than Chaos, is the developer of V-Ray, *see* Doc. 23-2, pp. 217, 265. Therefore, Chaos has satisfied every element of its claims for federal and Arkansas trademark dilution in Counts 3 and 7 of its Counterclaim.

### d. Claim 8—Arkansas Deceptive Trade Practices Act

The reader will recall that none of the trademark claims discussed in the preceding three subsections of this Opinion and Order require Chaos to prove that it suffered actual monetary damage; rather, they simply require showing "confusion" or "dilution" of a mark, whether actual or likely, as the case may be. But unlike these aforementioned trademark claims, the ADTPA requires a private claimant to prove that *actual monetary damages were proximately caused* to Chaos *by* Visual Dynamics' alleged deceptive trade practice. *See* Ark. Code Ann. § 4-88-113(f)(1)(A). And here, it is not at all clear to the Court from the record on summary judgment whether Visual Dynamics' use of the vray.com website has caused Chaos to lose any money at all—or even if it has, then how the amount of such loss could reasonably be calculated. Indeed, Chaos's damages expert does not appear even to offer an opinion on the matter; instead he confines his analysis solely to the issue of Visual Dynamics' profits, in support of a disgorgement theory of damages for

Chaos's trademark claims. *See, e.g.*, Doc. 23-2, p. 247, 273–74. Therefore, Chaos is not entitled to summary judgment on its ADTPA claim against Visual Dynamics, because a material factual dispute remains as to whether Visual Dynamics' allegedly deceptive trade practice has proximately caused any actual monetary damage to Chaos.

## 2. Visual Dynamics' Defenses against Chaos's Claims

Now having made the preliminary finding that, viewing the record in the light most favorable to Visual Dynamics, Chaos has satisfied each element of each of its claims except its ADTPA claim, the Court turns to the matter of Visual Dynamics' asserted defenses to Chaos's claims. Specifically, the Court addresses the defenses raised in Visual Dynamics' Motion for Summary Judgment, as well as in its Response to Chaos's Motion for Summary Judgment on Visual Dynamics' Claims.

Visual Dynamics' Motion discusses three defenses at length. One of those defenses is that Chaos's trademark claims should fail because Visual Dynamics has only engaged in nominative fair use of the V-Ray mark. The doctrine of nominative use applies where the trademark at issue is "the only word reasonably available to describe a particular thing" and is therefore "pressed into service" by the demands of the occasion. *See New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992). Related to this notion is the principle that "[a]s a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner." *Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61 (2d Cir. 1992) (footnote omitted). For example, there is nothing inherently unlawful about a person sub-reselling V-Ray products. Nevertheless, this defense is easily rejected here, because use of a mark in a website's domain name exceeds the minimal pressed-into-

service descriptive use that is permitted by the doctrine of nominative use. *Cf. E. & J. Gallo Winery v. Spider Webs Ltd.*, 286 F.3d 270, 275 (5th Cir. 2002) (not fair use); *Bulbs 4 E. Side, Inc. v. Ricks*, 199 F. Supp. 3d 1151, 1166–67 (same). In other words, Visual Dynamics does not need to use a website with the domain name of "vray.com" to engage in the legitimate sale of V-Ray products online.

Visual Dynamics also asserts the defense of waiver against all of Chaos's claims, referring at times to the alleged waiver as a "license," *see* Doc. 31, p. 5, or as a "waiver/license," *see id.* at 6. But as the Court has already ruled *supra*, whatever license Chaos may have given Visual Dynamics to use its V-Ray mark ended when the parties' authorized-reseller agreement was terminated on November 9, 2012. However, although the termination letter does not explicitly say whether Visual Dynamics would be reauthorized to sub-resell V-Ray products on vray.com just as Visual Dynamics had been permitted to do before becoming an authorized reseller, it does *imply* such permission by demanding that Visual Dynamics place disclaimers on, *inter alia*, vray.com's "product pages." *See* Doc. 37-1, p. 10. But then on the other hand, seven months after the termination took effect, Chaos sent Visual Dynamics a letter demanding that Visual Dynamics cease all further use of the V-Ray mark and turn over the registration of vray.com to Chaos. *See* Doc. 23-2, pp. 56–57. Yet, then another three and a half years passed by before Chaos took any legal action to enforce its trademark rights against Visual Dynamics. So this issue of whether Chaos reissued an implied license to Visual Dynamics, post-termination of the reseller relationship, is all rather confusing.

And that is where Visual Dynamics' third, related defense of estoppel comes into play. In trademark cases, "[a]n estoppel can be created by a [claimant]'s knowing

acquiescence in [the] defendant's activities, or by an unreasonable delay coupled with prejudice, creating an estoppel by laches." 6 McCarthy on Trademarks and Unfair Competition § 32:105 (5th ed.) (footnotes omitted); *see* 15 U.S.C. § 1115(b)(9) (permitting "equitable principles, including laches, estoppel, and acquiescence" against trademark claims); Ark. Code Ann. §§ 4-71-213(b)(2), 4-71-214(a)(2) (subjecting remedies to "principles of equity," requiring injunctions to be "just and reasonable," and vesting the court with "discretion" with respect to the entry of monetary judgments). The cases and the secondary literature on these principles are a muddle, to say the least. *Compare* Restatement (Third) of Unfair Competition § 29, comment c (discussing "estoppe[l] by . . . 'acquiescence'" and stating that "[s]ome trademark infringement cases . . . speak synonymously of 'acquiescence' and 'laches'") *and ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62, 69 (2d Cir. 2002) ("Under these circumstances, it was reasonable for defendant to rely on plaintiff's silence as consent . . . . We therefore agree . . . that plaintiff acquiesced to defendant's use of [the mark].") *with 3M Co. v. Intertape Polymer Grp., Inc.*, 423 F. Supp. 2d 958, 965 (D. Minn. 2006) (distinguishing "estoppel by acquiescence" from "laches," in part on the grounds that the former requires an "affirmative word or deed") *and Masters v. UHS of Del., Inc.*, 631 F.3d 464, 469 (8th Cir. 2011) (treating laches, acquiescence, and estoppel as three different equitable defenses, despite favorably citing *3M*—which discussed "estoppel by acquiescence"—for the definition of "acquiescence"). This Court is required by the Federal Rules of Civil Procedure to construe pleadings "so as to do justice." Fed. R. Civ. P. 8(e). And the substance of Visual Dynamics' arguments regarding what it termed "waiver and estoppel" in its summary-judgment briefing, *see* Doc. 31, p. 4, and

"estoppel and waiver" in its Answer (Doc. 13) to Chaos's Counterclaim, *see* Doc. 13, ¶ 81, seems most clearly to fit with what the Eighth Circuit has called "[a]cquiescence," and defined—by directly quoting *3M*'s definition for "estoppel by acquiescence"—as "when 'the owner of the trademark, by conveying to the defendant through affirmative word or deed, expressly or impliedly consents to the infringement.'" *See Masters*, 631 F.3d at 469 (quoting *3M*, 423 F. Supp. 2d at 965).

As already mentioned above, Chaos's termination letter impliedly granted Visual Dynamics permission to sub-resell V-Ray products on vray.com, through its affirmative demand that Visual Dynamics place disclaimers on vray.com's V-Ray "product pages." *See* Doc. 37-1, p. 10. And eight months later, Chaos's demand letter squarely conflicted with that previous implied acquiescence. *See* Doc. 23-2, pp. 56–57. Visual Dynamics could fairly wonder then whether the left hand knew what the right hand was doing, and who truly spoke for Chaos on this matter. Chaos answered that question for Visual Dynamics by taking no action for the next three and a half years to legally enforce its trademark claims against Visual Dynamics. The point here is not simply that Chaos did nothing; it is that Chaos did nothing *after* making directly contradictory representations to Visual Dynamics "through affirmative word" as to whether it would consent to Visual Dynamics' continued use of the V-Ray mark. Under such factual circumstances, this Court believes the affirmative defense of estoppel by acquiescence is valid against all of Chaos's trademark claims.

However, there are limits to the effectiveness of this defense. For one thing, the Court has already found above that Visual Dynamics' use of the vray.com domain was characterized by "bad faith intent" within the meaning of 15 U.S.C. § 1125(d)(1)(A)(i), and

that a reasonable person in Visual Dynamics' position should have expected trademark infringement to result from its use of the V-Ray mark. The defense of acquiescence is not available against injunctive relief where there is intentional infringement. *Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.*, 88 F. Supp. 2d 914, 925 (C.D. Ill. 2000). This is because the *public* also has an interest in not being deceived. *See* Restatement (Third) of Unfair Competition § 29, comment d. As the United States Supreme Court has explained:

> The intentional use of another's trade-mark is a fraud; and when the excuse is that the owner permitted such use, that excuse is disposed of by affirmative action to put a stop to it. Persistence, then, in the use is not innocent, and the wrong is a continuing one, demanding restraint by judicial interposition when properly invoked. *Mere delay or acquiescence cannot defeat the remedy by injunction* in support of the legal right, unless it has been continued so long, and under such circumstances, as to defeat the right itself.

*Menendez v. Holt*, 128 U.S. 514, 523 (1888) (emphasis added). Chaos is therefore entitled to injunctive relief on its trademark claims against Visual Dynamics.

Nevertheless, the defense of acquiescence is still available against claims for monetary damages, even in the face of intentional infringement, depending on the equities of the situation. *See Bunn-O-Matic*, 88 F. Supp. 2d at 926. Here, it is indisputable that whatever damage Visual Dynamics' infringement may have done to Chaos's brand and goodwill, the fact is that Visual Dynamics nevertheless placed money in Chaos's pocket by sub-reselling Chaos's V-Ray products on vray.com. And although this next point is more typically seen in the context of laches, it seems especially true in this particular context of ongoing mutual financial benefit: there is a clear inequity in a claimant "waiting for [the] defendant to build up its business and profits" only to "years later file[] suit and demand[] an accounting of those profits." 6 McCarthy on Trademarks and Unfair

Competition § 31:4 (5th ed.). Accordingly, Chaos will be estopped from collecting any money damages on its trademark claims against Visual Dynamics in this case.

However, this estoppel defense is not available against Chaos's ADTPA claim. As this Court has previously observed, "[c]onsumer protection statutes are intended to be construed broadly in favor of the consumer, such that applying a common-law defense to a consumer's claim may stymie the legislative intent." *Chruby v. Global Tel\*Link Corp.*, 2017 WL 4320330, at \*10 (W.D. Ark. Sept. 28, 2017) (collecting cases). Granted, here the claimant is not a consumer. But as already noted, the consuming public has an interest that is furthered by Chaos's claims. Certainly, a statute may explicitly provide for the preservation of some common-law defenses, just as the federal and Arkansas trademark statutes do. But the Court is unaware of any similar provision in the ADTPA that permits the use of a common-law defense against it. *See id.* So Visual Dynamics will not be permitted to assert its estoppel defense against Count 8 of Chaos's Counterclaim.

Finally, Visual Dynamics' Motion concludes with some briefly stated arguments that it terms "miscellaneous." The first is that the ADTPA "does not give a private cause of action to a product manufacturer or developer such as Chaos that alleges its product was involved in a deceptive trade practice." (Doc. 31, p. 9). The Court believes this argument has some intuitive appeal, but Visual Dynamics does not cite any authority in support of this proposition, and the Court is likewise unaware of any. Therefore, the Court rejects it, at least at this stage of proceedings. The second is that the Arkansas trademark statute "only gives a trademark infringement cause of action to trademark holders who register their mark(s) with the Arkansas Secretary of State," and that Chaos has never

fulfilled that particular condition. *See id.* The Court already observed likewise in Section III.B.1.a, *supra.* Chaos in its Response, offers no rebuttal to this point. Accordingly, Visual Dynamics is entitled to summary judgment on Count 5 of Chaos's Counterclaim, which will be **DISMISSED WITH PREJUDICE**.[5]

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Chaos's Motion for Summary Judgment against Visual Dynamics' Claims (Doc. 22) is **GRANTED**, Chaos's Motion for Summary Judgment on Its Counterclaims (Doc. 23) is **GRANTED IN PART AND DENIED IN PART**, and Visual Dynamics' Motion for Summary Judgment (Doc. 28) is **GRANTED IN PART AND DENIED IN PART** as follows:

- Chaos is awarded summary judgment on all of Visual Dynamics' claims, and Visual Dynamics' Complaint (Doc. 1) is **DISMISSED WITH PREJUDICE**.

- Chaos is awarded partial summary judgment on Counts 1, 2, 3, 4, 6, 7, and 9 of its Counterclaim (Doc. 7), in that it has satisfied all the elements of these claims and is thereby entitled to injunctive relief, the scope of which shall be determined on a later date. However, Chaos is estopped from recovering any monetary damages on these Counts.

- Visual Dynamics is awarded summary judgment on Count 5 of Chaos's Counterclaim, and that Count is **DISMISSED WITH PREJUDICE**.

---

[5] Visual Dynamics offers two additional "miscellaneous" arguments which are foreclosed by this Court's rulings *supra* on "bad faith intent" under 15 U.S.C. § 1125(d)(1)(A)(i) and with regard to whether Chaos's V-Ray mark is "famous." *See* Doc. 31, pp. 9–10. Accordingly, the Court will not reach those arguments here.

- Count 8 of Chaos's Counterclaim survives summary judgment and will be tried to a jury.

- After Count 8 of Chaos's Counterclaim is tried to a jury, the Court will receive briefing from the parties, and also conduct an evidentiary hearing if necessary, to determine the specific nature and scope of injunctive relief to which Chaos is entitled.

**IT IS SO ORDERED** on this _____12th_____ day of February, 2018.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE